## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 15-\_\_\_\_\_ |
| | : | |
| v. | : | Date Filed: _____, 2015 |
| | : | |
| CHAKA FATTAH, SR. | : | VIOLATIONS: |
| HERBERT VEDERMAN | | 18 U.S.C. § 1962(d) (RICO conspiracy – 1 |
| ROBERT BRAND | : | count) |
| KAREN NICHOLAS | | 18 U.S.C. §§ 1343, 1349 (wire fraud |
| BONNIE BOWSER | : | conspiracy – 1 count) |
| | | 18 U.S.C. §§ 1343, 1346, 1349 (honest |
| | : | services wire fraud conspiracy – 1 count) |
| | | 18 U.S.C. §§ 1341, 1349 (mail fraud |
| | : | conspiracy – 1 count) |
| | | 18 U.S.C. § 1014 (false statements to banks |
| | : | – 1 count) |
| | | 18 U.S.C. § 201 (bribery – 2 counts) |
| | : | 18 U.S.C. § 371 (conspiracy – 1 count) |
| | | 18 U.S.C. § 1341 (mail fraud – 6 counts) |
| | : | 18 U.S.C. § 1343 (wire fraud – 3 counts) |
| | | 18 U.S.C. § 1344 (bank fraud – 1 count) |
| | : | 18 U.S.C. § 1519 (falsification of records – |
| | | 8 counts) |
| | : | 18 U.S.C. § 1956 (money laundering |
| | | conspiracy – 1 count) |
| | : | 18 U.S.C. § 1957 (money laundering – 2 |
| | | counts) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | | Forfeiture Allegations |

## I N D I C T M E N T

## COUNT ONE

## CONSPIRACY TO COMMIT RACKETEERING
### 18 U.S.C. § 1962(d)

**THE GRAND JURY CHARGES THAT:**

All dates and times in this Indictment are alleged to be "on or about" the specific date stated.

1.    At all times relevant to this Indictment, defendants CHAKA FATTAH, SR., HERBERT VEDERMAN, ROBERT BRAND, KAREN NICHOLAS, and BONNIE BOWSER, and others known and unknown to the Grand Jury, were members and associates of a criminal organization whose members and associates engaged in criminal acts principally in Philadelphia, the Eastern District of Pennsylvania, the District of Columbia, and elsewhere.

### The Enterprise

2.    The criminal organization, including its leadership, members, and associates, constituted an Enterprise as defined in Title 18, United States Code, Section 1961(4), namely, a group of individuals associated in fact.   The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.   The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### Roles of the Defendants

3.    Defendant CHAKA FATTAH, SR., has been a member of the United States House of Representatives (the "House"), representing the 2nd Congressional District of Pennsylvania since 1995.   In 2006-2007, FATTAH entered the race for Mayor of the City of Philadelphia and was defeated.   His mayoral run was supported by the Fattah for Mayor ("FFM") campaign

organization.   FATTAH's Congressional reelection campaigns have been supported by Fattah for

Congress ("FFC").   FATTAH was the leader of the Enterprise and directed other members of the

Enterprise in furtherance of its affairs.

4.      Defendant HERBERT VEDERMAN, a former Deputy Mayor in the City of

Philadelphia, was a finance director for FFM and lobbyist and senior consultant in the government

affairs practice of a Philadelphia-based law firm, although VEDERMAN himself is not an

attorney.   VEDERMAN acted in his capacity as a finance director for FFM from 2007 through at

least December 2011 as he continued to negotiate the resolution of FFM's outstanding campaign

debts on FATTAH's behalf.   As a lobbyist and consultant in the government affairs practice at the

law firm, VEDERMAN reported to and was supervised by a registered lobbyist.   From 2008

through 2011, FATTAH advocated for VEDERMAN's nomination for federal posts in the

Executive Branch, including an ambassadorship.

5.      Defendant ROBERT BRAND is the founder of Company 2, a Philadelphia-based

for-profit public policy technology company, and the spouse of a former FATTAH Congressional

staffer.   Company 2 maintained an address on South Broad Street in Philadelphia, Pennsylvania.

6.      Defendant KAREN NICHOLAS was Chief Executive Officer ("CEO") of

Educational Advancement Alliance ("EAA"), a FATTAH-founded nonprofit entity, and a former

FATTAH Congressional staffer.   For years, NICHOLAS and EAA were responsible for

organizing the annual Fattah Conference on Higher Education (the "Conference").   NICHOLAS

also managed federal grant funds and various financial matters for College Opportunity Resources

for Education Philly ("CORE Philly"), another FATTAH-founded nonprofit entity described

below.

7.     Defendant BONNIE BOWSER was the District Chief of Staff in Philadelphia in defendant FATTAH's Congressional office and Treasurer of both the FFM and FFC campaign organizations.   BOWSER held power of attorney for FATTAH personally, and was engaged in FATTAH's campaign and personal financial transactions.

## Additional Co-Conspirators

8.     Thomas Lindenfeld, charged elsewhere, was a political consultant and founded a political consulting firm named LSG Strategies ("LSG") based in Washington, DC.   Lindenfeld participated in unlawful and other activities in furtherance of the conduct of the affairs of the Enterprise.

9.     Gregory Naylor, charged elsewhere, has known FATTAH personally for over 30 years and was a former FATTAH Congressional staffer and, before that, worked for FATTAH when FATTAH was a Pennsylvania state senator.   Naylor was also a political consultant and founder of a political consulting firm named Sydney Lei & Associates ("SLA").   At times relevant to this Indictment, Naylor and SLA had contracts with EAA.   In approximately 2008, CORE Philly's executive director left the nonprofit, and pursuant to discussions with FATTAH, Naylor took over CORE Philly and reported to FATTAH.   Naylor participated in unlawful and other activities in furtherance of the conduct of the affairs of the Enterprise.

## Affiliates of the Fattah Enterprise

10.     Person E is the spouse of defendant CHAKA FATTAH, Sr.

11.     EAA was a nonprofit entity founded by FATTAH in 1990 with the publicly-announced purpose of providing educational information and opportunities to members of underrepresented groups.   EAA was created for beneficial purposes, and also to advance FATTAH's political stature.   EAA was routinely staffed by former legislative aides to FATTAH,

including NICHOLAS, among others.   For years, EAA was responsible for organizing
FATTAH's annual Conference.   The Conference was supported financially through charitable
grants and federal funds, facts well known to members of the Enterprise.   In particular, the
charitable arm of Sallie Mae, a financial institution specializing in student loans, provided
significant funding intended to endow the Conference for many years.   EAA itself was also
supported financially through charitable grants and federal funds, facts also well known to
members of the Enterprise.   Specifically, EAA received federal grant funding from the U.S.
Department of Justice ("DOJ"), the U.S. Department of Commerce, the National Aeronautics and
Space Administration ("NASA"), and the National Oceanic and Atmospheric Administration
("NOAA"), among other federal agencies.   As discussed below, EAA, and more specifically
NICHOLAS, managed federal grant funds and various financial matters for another
FATTAH-founded entity, CORE Philly.

12.     CORE Philly was a nonprofit entity founded by FATTAH in 2003 with the
publicly-announced purpose of forming a partnership among the City of Philadelphia, the School
District of Philadelphia, and the School Reform Commission to provide scholarships to
Philadelphia high school students.   CORE Philly was created for beneficial purposes, and also to
enhance FATTAH's political stature.   CORE Philly was routinely staffed by former legislative
aides to FATTAH.   At times relevant to this Indictment, NICHOLAS and EAA served as
fiduciary agents of various federal grants to CORE Philly.   Additionally, EAA and its officers
made payment on bills and invoices submitted to CORE Philly.

## Purposes of the Enterprise

13.     The purposes of the Enterprise included the following, among others:

        a.      Furthering and supporting the political and financial interests of FATTAH and his coconspirators through fraudulent and corrupt means;

        b.      Promoting FATTAH's political and financial goals through deception by concealing and protecting the activities of the Enterprise from detection and prosecution by law enforcement officials and the federal judiciary, as well as from exposure by the news media, through means that included the falsification of documents and obstruction of justice.

## Racketeering Conspiracy

14.     From at least in or around 2006 to on or about the date of this Indictment, in the Eastern District of Pennsylvania and elsewhere, defendants

**CHAKA FATTAH, SR.,**
**HERBERT VEDERMAN,**
**ROBERT BRAND,**
**KAREN NICHOLAS, and**
**BONNIE BOWSER**

along with others known and unknown, being persons employed by and associated with the Enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts indictable under the following statutes:

        a.      Title 18, United States Code, Section 1341 (relating to mail fraud);

        b.      Title 18, United States Code, Sections 1343, 1346 (relating to wire fraud);

c.      Title 18, United States Code, Section 1344 (relating to financial institution fraud);

d.      Title 18, United States Code, Section 201 (relating to bribery);

e.      Title 18, United States Code, Section 1512 (relating to obstruction of justice and tampering with evidence); and

f.      Title 18, United States Code, Sections 1956 and 1957 (relating to money laundering).

15.      It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

## Manner and Means of the Enterprise

16.      The manner and means by which the defendants and their coconspirators agreed to conduct the affairs of the Enterprise included the following, among others:

a.      arranging for the receipt and concealment of an unlawful $1 million loan to support FATTAH's 2007 campaign for Mayor of the City of Philadelphia;

b.      stealing charitable and federal grant funds in order to repay $600,000 of that loan;

c.      engaging in a corrupt exchange in which FATTAH promised to use his position as a United States Congressman to obtain federal funds in the form of a questionable earmark for a non-profit entity that did not yet exist, in order to pay off another mayoral campaign debt;

d.      engaging in a fraud scheme in which FATTAH used congressional and mayoral campaign funds to pay his son's college debt while simultaneously defrauding creditors of his mayoral campaign through misrepresentations and the withholding of material information;

e.      using campaign funds to pay personal expenses for FATTAH and his spouse;

f.      engaging in a bribery scheme in which FATTAH received a series of payments and things of value from VEDERMAN in exchange for a series of official acts that FATTAH took on behalf of VEDERMAN, including attempting to secure VEDERMAN's appointment as a United States Ambassador or in another federal post, and hiring VEDERMAN's girlfriend on FATTAH's Congressional staff;

g.      defrauding a financial institution and concealing an $18,000 bribery payment by concocting a sham sale of Person E's Porsche;

h.      defrauding a federal agency of $50,000 obtained for the purported purpose of holding an educational Conference which never took place;

i.      obstructing justice by creating sham contracts and false entries in books and records; and

j.      making false filings with federal, state, and local election agencies to disguise and conceal illegal contributions and expenditures in order to promote the image of FATTAH's political strength and viability.

### The Schemes

### The 2007 Mayoral Campaign

17.      To promote transparency and ensure compliance with the applicable election laws including the applicable contribution limits, both the State Election Code of Pennsylvania and the City of Philadelphia's Campaign Finance Law require that candidates for city office periodically file campaign finance disclosure forms detailing the political contributions received by a candidate's campaign, expenditures made by the campaign, and the campaign's unpaid debts. The campaign finance disclosure forms must be signed by the filers before a notary affirming that the candidates' campaigns "[have] not violated any provisions" of the applicable campaign finance laws.

18.      In 2007, the City of Philadelphia applied the first ever campaign contribution limits to a city-wide race for office, in this case the mayoralty.   The limits set by the City were $2,500 by an individual to a candidate in a calendar year or $10,000 by a PAC, corporate or business entity to a candidate in a calendar year.   In that race, a self-funded wealthy candidate contributed $250,000 of his own fortune to his campaign.   The contributions limits did not apply to a candidate's personal funding of his own campaign.   A unique feature of Philadelphia's campaign finance

regime doubled the contribution limits in such a scenario to "level the playing field" between self-funded wealthy candidates and candidates dependent upon outside contributions.   Therefore, the $10,000 corporate limit became a $20,000 limit in the 2007 race for mayor.

19.   FATTAH, BOWSER, Lindenfeld, and Naylor engaged in a scheme to violate the local campaign finance laws during FATTAH's race for Mayor of the City of Philadelphia in or around April 2007.   FATTAH arranged for an illegal $1 million campaign loan from Person D. To conceal this loan, FATTAH and Lindenfeld routed the money from Person D through Lindenfeld's political consulting firm, LSG.   At FATTAH's direction, Lindenfeld, on behalf of LSG, executed a promissory note with Person D, and then used Person D's money, received via wire transfer, to pay various expenses of the FATTAH mayoral campaign directly.   Lindenfeld also distributed some of Person D's money to Naylor, who also paid various expenses of the FATTAH mayoral campaign directly.   On primary Election Day, Naylor and BOWSER distributed some of Person D's contribution in cash as "walking around money" on FFM's behalf. Of the illegal $1 million campaign loan, $400,000 went unspent, and Lindenfeld returned the unspent balance to Person D.   None of the money received from Person D and spent on FATTAH's behalf during the mayoral campaign was attributed to Person D in any of FFM's Campaign Finance Reports.

20.   To have some documentation of the $200,000 in "walking around money" and to disguise the source of the funds on FFM's Campaign Finance Reports, Lindenfeld and Naylor, at FATTAH's direction, agreed that Naylor would submit a false invoice for the cash from SLA to FATTAH's mayoral campaign.   The invoice made it appear as though SLA incurred expenses on behalf of FATTAH and was billing those expenses to FATTAH's campaign.   Although FATTAH, BOWSER, Lindenfeld, and Naylor were well aware that the campaign did not owe

SLA any money for the "Election Day Operation," Naylor prepared the false invoice from SLA and addressed it to BOWSER at FFM in the amount of $193,580.19.   FATTAH and BOWSER subsequently reported the $193,580.19 "debt" from the fake invoice on FFM's mandatory annual Campaign Finance Reports.

21.   In or around late 2007, Person D experienced acute financial difficulty and instructed his son to contact Lindenfeld at LSG to call in the remaining $600,000 debt. Lindenfeld reported Person D's demand for repayment to FATTAH and his friends, associates, and current or former staffers, including BOWSER and Naylor.   FATTAH arranged for the FATTAH-founded nonprofit entity EAA, run by NICHOLAS, to pay the debt.

22.   The funds used by EAA to repay the debt were derived from money received from the charitable arm of Sallie Mae which had endowed the annual Fattah Conference on Higher Education, and from a federal grant from the National Aeronautics and Space Administration ("NASA") which was given to EAA for educational purposes.   These educational funds could not lawfully be used to repay the debt of a political campaign, as the conspirators knew.   The conspirators accordingly engaged in an elaborate effort to conceal the improper use of EAA's funds to pay the debt to Person D.

23.   NICHOLAS, on behalf of EAA, first transferred the funds used to repay the $600,000 debt from EAA to Company 2, the public policy firm founded and run by BRAND. BRAND, on behalf of Company 2, then transferred the money to Lindenfeld's firm, LSG, and LSG proceeded to repay the debt to Person D.   BRAND, for Company 2, and Lindenfeld, for LSG, executed a fake contract to disguise the purpose of the movement of money from Company 2 to LSG.

24.     Approximately six months after the money moved from EAA to Company 2, BRAND received a subpoena from the Office of Inspector General of the U.S. Department of Justice, where investigators were scrutinizing EAA's finances.   In response to the subpoena, NICHOLAS, for EAA, and Brand, for Company 2, executed a fake contract for services between EAA and Company 2 to disguise the fraudulent nature of the transaction between EAA and Company 2.   In further efforts to conceal the scheme, BOWSER, NICHOLAS, BRAND, Lindenfeld, and Naylor made false entries in the business records for FFM, EAA, LSG, and Company 2.   The members of the Enterprise also made false entries in tax returns and campaign finance disclosure forms.

25.     FATTAH and BOWSER further disguised the scheme and publicly reduced the fictitious "debt" to Naylor and SLA by falsely reporting annually that SLA had "forgiven" FFM's obligation to the consulting firm in $20,000 increments each year.   In early 2010, FATTAH and BOWSER began falsely documenting "in-kind" contributions purportedly made by SLA to the mayoral campaign in the amount of $20,000 in FFM's annual Campaign Finance Report although no such contributions had been made by SLA.   The deception was continued in each subsequent Campaign Finance Report filed through 2014, in which FATTAH, BOWSER, and FFM reduced the debt to SLA in the amount of $20,000 per year.   Each year, FATTAH and BOWSER falsely certified the accuracy of FFM's Campaign Finance Report.

26.     The election laws of Pennsylvania and Philadelphia are clear that "debt forgiveness" is a political contribution, and therefore subject to the contribution limits in a calendar year.   In $20,000 increments, the members of the Enterprise would need ten (10) years to publicly write off the SLA debt in its entirety.   Since the members of the Enterprise began the write downs in 2010, it would be 2019 before the members of the Enterprise could write off the

SLA debt entirely and appear publicly to be in compliance with the applicable campaign finance laws.

### "Blue Guardians"

27.    After FATTAH lost the mayoral primary in May 2007, FATTAH's mayoral campaign owed Lindenfeld and LSG a substantial sum of money for the work Lindenfeld and LSG had done on FATTAH's campaign, which included compensating Lindenfeld for his role in funneling the $1 million campaign contribution from Person D into the mayoral race and repaying that loan using the stolen charitable and grant funds.   In 2008, FATTAH met with Lindenfeld to discuss the outstanding sum owed to LSG by FATTAH's mayoral campaign.   During the meeting, FATTAH told Lindenfeld that FATTAH could not legitimately raise the funds necessary to pay Lindenfeld and LSG within the constraints of the campaign finance laws.   FATTAH also told Lindenfeld that FATTAH and his campaign, FFM, needed to write down the debt to LSG publicly on its Campaign Finance Reports.   In addition to being required under the Pennsylvania Election Code and the City of Philadelphia's Campaign Finance Law, the Campaign Finance Reports are used in the political arena as a measure of a candidate's political strength and viability because the disclosures show how much money a political candidate raised, how much the candidate has spent, and whether the candidate satisfies his campaign's financial obligations.   If the candidate appears to ignore his campaign's creditors, that makes it more difficult to raise future funds, hire campaign staff, and obtain services from vendors during future campaigns while also creating issues related to the candidate's public perception and rendering the candidate vulnerable to attack from political opponents.   To resolve the debt to Lindenfeld's satisfaction and publicly erase the debt, FATTAH proposed using his status as a public official to instead obtain a federal grant for Lindenfeld's benefit.

- 12 -

28.    FATTAH proposed that Lindenfeld create a nonprofit organization called "Blue Guardians." Despite the fact that Lindenfeld was in the business of political consulting, FATTAH suggested that "Blue Guardians" could obtain federal funding for vaguely defined efforts concerning coastal environmental conservation. Lindenfeld proceeded to create this organization, although it never engaged in any activity. FATTAH instructed Lindenfeld to use a Philadelphia address for "Blue Guardians," and at FATTAH's direction, Lindenfeld obtained BRAND's agreement to provide BRAND's own Philadelphia business address as a mail drop for the not yet established "Blue Guardians."

29.    In exchange for FATTAH's promise of federal funds, FATTAH sought and received Lindenfeld's agreement to reduce the approximate $130,000 of reported debt owed by FATTAH to Lindenfeld's LSG and also to report the debt reduction on FFM's publicly filed Campaign Finance Reports. FATTAH and BOWSER then began to record reductions to the debt owed to Lindenfeld and LSG on FFM's Campaign Finance Reports annually.

30.    To conceal the corrupt arrangement to settle FATTAH's mayoral campaign debt to Lindenfeld and LSG, FATTAH, BOWSER, and Lindenfeld, and others, known and unknown, agreed to falsify FATTAH's Campaign Finance Reports from the mayoral race. FATTAH and BOWSER disguised the bribery scheme while at the same time publicly reducing the debt by falsely reporting annually that Lindenfeld had "forgiven" FFM's obligation to his firm in $20,000 increments each year. In early 2010, FATTAH and BOWSER began falsely documenting "in-kind" contributions purportedly made by LSG to the mayoral campaign in the amount of $20,000 in FFM's annual Campaign Finance Report. The deception was continued in each subsequent Campaign Finance Report filed through 2014, in which FATTAH, BOWSER, and

- 13 -

FFM reduced the debt to LSG in the amount of $20,000 per year.   Each year, FATTAH and

BOWSER falsely certified the accuracy of FFM's Campaign Finance Report.

     31.     As set forth above, the election laws of Pennsylvania and Philadelphia are clear that

"debt forgiveness" is a political contribution, and therefore subject to the contribution limits in a

calendar year.   In $20,000 increments, the members of the Enterprise would need seven (7) years

to publicly write off the LSG debt in its entirety.   Since the members of the Enterprise began the

write downs in 2010, it would be 2016 before the members of the Enterprise could write off the

LSG debt entirely and appear publicly to be in compliance with the applicable campaign finance

laws.

**Fraud and Theft of Campaign Funds While Deceiving Campaign Creditors**

     32.     In 2007, FATTAH initiated another fraud scheme in which members of the

Enterprise unlawfully used campaign funds to repay his son's student loan debt.   Specifically,

FATTAH used FFM and FFC campaign funds funneled through Naylor's consulting company,

SLA, to pay down the student loan debt FATTAH's son owed to Drexel University and Sallie

Mae.   The son's student debt at one point was over $100,000.   Between 2007 and 2011, Naylor,

through SLA, paid Drexel and later Sallie Mae, which held the loans on FATTAH's son's debt, a

total of approximately $22,263.   During the scheme, at FATTAH's direction, FFM Treasurer

BOWSER signed and placed in the U.S. mail checks drawn on FFM's account to Naylor.   In turn,

Naylor issued checks from SLA to Drexel and Sallie Mae and placed them in the U.S. mail.   To

fund the FFM disbursements to SLA, BOWSER, the Treasurer of both FFC and FFM, made

numerous transfers from FATTAH's FFC account to FATTAH's FFM account.

     33.     Early in the scheme, on or about January 7, 2008, BOWSER moved $10,000 from

FFC's account to FFM's account and issued an FFM check to Naylor's SLA in the amount of

$10,900. Naylor, in turn, used the $10,900 SLA received from BOWSER to make payments on the student loan debt of FATTAH's son. In total, BOWSER moved funds from FFC to FFM on five occasions in furtherance of the scheme. The last such movement of funds took place on or about November 23, 2010, when BOWSER moved an additional $5,000 from FFC's account to FFM's account and issued an FFM check to Naylor's SLA in the amount of $5,000. The check memo section falsely documented "election day expenses" as the reason for the check. Naylor in turn used the $5,000 SLA received from that check to make additional payments on the student loan debt. In all, Naylor made 34 payments totaling approximately $23,063.52 on behalf of FATTAH's son using misappropriated funds from FATTAH's two campaign accounts.

34.     To conceal the scheme and to avoid the appearance of taxable income to SLA (as a result of serving as a conduit for the student loan payments from FATTAH's campaign funds), Naylor created false IRS form 1099s for 2007, 2008, and 2010. Each form 1099 concealed the misuse of campaign funds by falsely claiming that the payments made at FATTAH's direction on behalf of FATTAH's son to retire the son's college debt were "earned income" to the son. Naylor's serial false submissions reported to the government that the payments were for services rendered by FATTAH's son as an independent contractor to Naylor's consulting firm, SLA, when in fact no such services were rendered.

35.     While FATTAH and his fellow conspirators were stealing campaign funds to pay down the college debt of FATTAH's son, members of the Enterprise, specifically FATTAH and VEDERMAN, renegotiated FFM's campaign debt with some of its vendors, including Printer 1 and Law Firm 1. When FATTAH lost the mayoral primary in 2007, FFM owed Law Firm 1 approximately $80,977 in legal fees. In or around December 2008, VEDERMAN and BOWSER, at FATTAH's direction, obtained from Law Firm 1 documentation memorializing an agreement to

forgive approximately $20,000 in unpaid campaign debt after the members of the Enterprise represented to Law Firm 1 that FATTAH and FFM could not raise the funds necessary to retire the unpaid debt in full.   In or around March 2009, VEDERMAN and BOWSER, at FATTAH's direction, obtained from Law Firm 1 documentation memorializing an agreement to forgive an additional amount, approximately $20,000.

36.    When FATTAH lost the mayoral primary in 2007, FFM owed Printer 1 approximately $118,000 for charges related to direct mailings on behalf of the campaign.   In or around December 2011, VEDERMAN, at FATTAH's direction, obtained Printer 1's agreement to forgive approximately $30,000 in unpaid campaign debt after representing to Printer 1 that FATTAH and FFM could not raise the funds necessary to retire the unpaid debt in full.   At the time of the negotiations, FFM still owed Printer 1 approximately $55,000 in unpaid bills.

37.    At no time did the members of the Enterprise disclose to Law Firm 1 or Printer 1 that FATTAH's campaign money was being used to pay off the college debt of FATTAH's son when those funds could have been used to pay down or retire the campaign debt owed to Law Firm 1 and Printer 1, among others.   After withholding this material information and securing the agreements from the creditors to forgive various campaign debts, FATTAH and BOWSER began to correspondingly reduce the debt owed by FFM to Law Firm 1 and Printer 1 on FFM's publicly filed Campaign Finance Reports.

38.    To conceal the arrangement with Naylor to pay the student loan debt of FATTAH's son using campaign funds, FATTAH and FFM Treasurer BOWSER falsely documented the tuition payments as "expenditures" against a fictitious invoice generated by Naylor in the amount of $193,580.19 during the scheme described in Paragraphs 17 through 26.   These deceptions were continued in each Campaign Finance Report filed annually during ensuing years through which

FATTAH's mayoral campaign continued to publicly reduce the fictitious debt to Naylor by amounts corresponding to the tuition payments.

### FATTAH's Bribery Scheme with Pennsylvania Lobbyist VEDERMAN

39.     From 2008 through 2012, FATTAH received a series of payments and things of value from VEDERMAN in exchange for a series of official acts by FATTAH on VEDERMAN's behalf.

40.     Beginning in or around November of 2008, FATTAH began a lengthy campaign to influence the Executive Branch and obtain for VEDERMAN a presidential appointment as a United States Ambassador or a federal appointment to a United States Trade Commission. FATTAH and his organization repeatedly pursued a federal appointment for VEDERMAN via meetings, emails, telephone calls, and letters with Elected Official B and various members of the Executive Branch including the White House Deputy Chief of Staff, the United States Trade Representative, and the President of the United States.

41.     In January 2012, FATTAH hired VEDERMAN's girlfriend, A.Z., onto his Congressional staff in the Philadelphia District Office run by BOWSER.

42.     In exchange for FATTAH's official action and influence, VEDERMAN provided money to FATTAH on multiple occasions.   VEDERMAN also agreed to sponsor a visa for FATTAH's live-in au pair and paid a portion of the au pair's college tuition.   Occasionally, VEDERMAN used FATTAH's adult son as a "pass through" to hide the payments.   Portions of those funds that were passed through FATTAH's son were ultimately used by FATTAH to pay personal expenses, including personal taxes.

43.     On or about January 13, 2012, VEDERMAN made an $18,000 payment via wire transfer to FATTAH so that FATTAH and Person E could deceive the Credit Union Mortgage

Association, Inc. ("CUMA") in qualifying for a mortgage on the purchase of a vacation home in the Poconos.   At FATTAH's direction, his District Chief of Staff, BOWSER, provided the wiring instructions to VEDERMAN.

44.   In order to deceive CUMA, evade the House ethics rules prohibiting gifts from lobbyists, and falsely omit the $18,000 payment from FATTAH's official Congressional Financial Disclosure form, FATTAH, VEDERMAN, BOWSER, and Person E falsely styled the $18,000 transaction as a car sale.   Specifically, the conspirators falsified records, including a bill of sale and paperwork related to the vehicle's title, in order to document the "sale" of Person E's 1989 convertible Porsche 911 Carrera (the "Porsche") to VEDERMAN.   FATTAH used the bribery proceeds from VEDERMAN to close on the vacation home.

45.   In fact, FATTAH and Person E still possessed, drove, and continued to insure the car well after the $18,000 payment was made by VEDERMAN, and VEDERMAN never took possession of the Porsche.   Specifically,

- On or about May 31, 2012, Person E renewed the annual registration for the Porsche in Person E's name with the Pennsylvania Department of Transportation;

- On or about June 13, 2012, Person E had the Porsche serviced in Conshohocken, PA and paid $1,575.73 for the maintenance;

- On or about September 24, 2012, FATTAH paid $1,141.90 from his FFC campaign account to the insurance company on the policy which insured Person E's Porsche;

- On or about October 23, 2012, FATTAH paid $573.45 from his FFC campaign account to the insurance company on the policy which insured Person E's Porsche;

- On or about November 30, 2012, Person E telephoned the insurance company which insured the Porsche and adjusted the car's insurance coverage for the winter months;

- On or about January 7, 2013, FATTAH paid $1,326.00 from his FFC campaign account to the insurance company on the policy which insured Person E's Porsche;

- On or about March 28, 2014, the Porsche was inspected by the FBI in FATTAH's garage at his home in Philadelphia where it was still parked twenty-six (26) months after the purported "sale" to VEDERMAN.

**Defrauding NOAA with Fictional Conference on Higher Education**

46.     NOAA is a federal agency focused on the condition of the oceans and the atmosphere, daily weather forecasts, severe storm warnings, climate monitoring, fisheries management, coastal restoration, and supporting marine commerce.   NOAA routinely accepts funding requests from nonprofit organizations for projects related to NOAA's mission, which includes an educational component.

47.     In or around December 2011, EAA, the FATTAH-founded nonprofit entity, was experiencing financial difficulty and was searching for alternative sources of federal funding.   On or about December 13, 2011, NICHOLAS, the CEO of EAA, contacted NOAA with a "special and formal" request that NOAA grant $409,000 to EAA for the annual FATTAH-founded National Conference on Higher Education (previously named the "Fattah Conference on Higher

Education").   In her email communication with the agency, NICHOLAS included a letter which noted that EAA's next Conference was to be held from February 17 through 19, 2012, at the Sheraton in Philadelphia.   However, NICHOLAS had already missed the application deadline for fiscal year 2012-2013, which included the proposed February 2012 conference date.   By email, on or about January 11, 2012, NOAA informed NICHOLAS that the agency would in principle provide $50,000 to support the Conference.   NICHOLAS still needed to complete the necessary application materials for NOAA's federal grant funds, and the application would require approval in the ordinary course of the grant application process.

48.      On or about May 11, 2012, NICHOLAS provided by email to NOAA a formal application for a $50,000 grant to be used towards the $400,000 total cost for a National Conference on Higher Education.   The narrative proposed that the funds would be used between January 1, 2012, and June 30, 2012, but did not specify the actual date of the conference.   By email on or about June 28, 2012, NOAA requested NICHOLAS to make changes to the description of the project and to provide the date of the conference.   On or about July 12, 2012, NICHOLAS emailed NOAA a second narrative which claimed that the 2012 conference was to take place from October 19 through 21, 2012, at the Philadelphia Sheraton Hotel.   On or about August 7, 2012, based on the representations made by NICHOLAS, NOAA approved a "late action request" to provide grant funding in the amount of $50,000 for the purported October 2012 conference, and NICHOLAS certified her agreement to comply with the agency's award provisions.   Although no October conference was ever held, NICHOLAS subsequently took the NOAA funds and spent the funds on Naylor and herself.

- 20 -

## Overt Acts

In furtherance of the conspiracy and to affect its objects, the defendants and other co-conspirators known and unknown to the Grand Jury committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

### I.   Illegally Financing the 2007 Mayoral Campaign

1.      In or around April 2007, FATTAH met in Philadelphia with Person D, who had previously contributed to FATTAH's mayoral Exploratory Committee, to discuss the financial difficulties in FATTAH's mayoral campaign.   During the discussion, FATTAH sought additional financial assistance from Person D for the campaign and obtained an agreement from Person D to meet with Lindenfeld.   After meeting with Person D, FATTAH directed Lindenfeld to arrange a meeting with Person D.

2.      In or around April 2007, Lindenfeld and his partner in LSG met with Person D at Person D's office in Tyson's Corner, Virginia.   Lindenfeld discussed FATTAH and the campaign with Person D.

3.      Shortly after the meeting, Lindenfeld reported to FATTAH that he had met with Person D as directed, and FATTAH told Lindenfeld to expect to hear from Person D again.   In their next discussion, Lindenfeld and Person D made arrangements for obtaining a $1 million loan to be used in support of FATTAH's mayoral campaign.   After the additional discussions with Person D, Lindenfeld explained the loan arrangements with Person D to FATTAH, and obtained FATTAH's personal commitment to repay the loan to Person D.

### A.   Disguising the Illegal Contribution

4.      Upon receiving the $1 million from Person D, FATTAH, Lindenfeld, and their co-conspirators routed the $1 million loan from Person D through Lindenfeld's political

- 21 -

consulting firm, LSG.   Lindenfeld and LSG executed a promissory note with Person D, and used

the Person D-supplied funds - received via wire transfer - to pay various expenses of FATTAH's

campaign directly in advance of the mayoral primary.

5.      Lindenfeld directed a portion of the $1 million to Naylor's firm SLA, and Naylor

and BOWSER spent that money on behalf of the campaign.

6.      Between on or about May 1, 2007, and primary Election Day, at FATTAH's

direction, Lindenfeld, Naylor, and BOWSER spent in total approximately $600,000 from the

illegal campaign contribution from Person D in support of FATTAH's mayoral campaign.

7.      Naylor and BOWSER spent approximately $200,000 in cash of the illegal

campaign contribution from Person D as "walking around money" in support of the campaign for

Mayor on Election Day itself, May 15, 2007.

8.      To have some documentation of the $200,000 in "walking around money" and to disguise

the source of the funds on campaign finance reports, Lindenfeld and Naylor, at FATTAH's

direction, agreed that Naylor would submit a false invoice for the cash from SLA to FATTAH's

mayoral campaign.   Although FATTAH, BOWSER, Lindenfeld, and Naylor were well aware

that the campaign did not owe SLA any money for the "Election Day Operation," Naylor prepared

the false invoice for $193,580.19 from SLA and addressed it to BOWSER at FFM.

9.      After Election Day, FATTAH, BOWSER, and Naylor coordinated to use

$49,058.27 of Person D's contribution left in SLA's operating account to arrange final payments

for FATTAH's salaried campaign staff, including, for example, a $7,820 payment to FATTAH's

then Congressional chief of staff, who had taken a leave of absence to run FFM, and a $5,245

payment to FATTAH's principal communications advisor.   FATTAH and BOWSER did not

disclose, and deliberately omitted, on FFM's Campaign Finance Reports the source of the funds used to compensate FFM's employees after the primary.

10.    After FATTAH lost the primary election and ended his mayoral campaign, FATTAH discussed with Lindenfeld, on or about June 22, 2007, returning the $400,000 in unspent loan proceeds to Person D.   With FATTAH's concurrence, Lindenfeld mailed Person D a check for $400,000, leaving a $600,000 loan balance owed to Person D.

11.    After FATTAH lost the mayoral primary, FATTAH and BOWSER reported FFM's outstanding debt in its "Campaign Finance Statement" publicly filed with the Commonwealth of Pennsylvania on or about June 15, 2007.   In that "Campaign Finance Statement," FATTAH and BOWSER did not report the loan from Person D and falsely reported the outstanding campaign "debt" to Naylor's SLA of $193,580.19 as documented by Naylor in the false invoice.

### B.   Scheming to Repay the Balance of the Illegal Contribution

12.    After Lindenfeld reported Person D's demand to be repaid to FATTAH and his associates, on or about January 9, 2008, Lindenfeld received an email from BRAND, owner of Company 2, which suggested forming a supposed "strategic partnership" between LSG and Company 2.   BRAND subsequently proposed an upfront payment of $600,000 to LSG, precisely the amount owed to Person D.

13.    On or about January 14, 2008, BRAND transmitted to NICHOLAS at EAA a proposal which sought "substantial upfront funding" to purportedly provide public policy software for EAA.

14.     On or about January 24, 2008, Lindenfeld emailed BRAND and provided him with wiring instructions for a payment to be made to LSG's bank account at United Bank in Bethesda, Maryland.

15.     On or about January 27, 2008, at 10:59 p.m., BRAND emailed to NICHOLAS a proposed agreement between Company 2 and EAA.   In the email, BRAND stated that he would "send someone to pick up the check at about 1 PM."

16.     Afterwards, on or about January 27, 2008, at 11:12 p.m., BRAND emailed to Lindenfeld a proposed contract in which Company 2 promised to pay LSG an advance sum of $600,000 by January 31, 2008.

17.     Lindenfeld replied the same day at 11:13 p.m., inquiring of BRAND whether he received the wiring instructions for the payment to LSG.   Lindenfeld also executed the contract and returned it to BRAND.

### C.   Stealing Charitable Funds and Repaying the Illegal Contribution

18.     On or about January 24, 2008, NICHOLAS wrote a check for $500,000 from EAA payable to Company 2.   To issue the $500,000 check from EAA, NICHOLAS used $500,000 received by EAA from the Sallie Mae Fund which was intended to support the annual Fattah Conference on Higher Education.   When accepting the Sallie Mae Fund's donation, NICHOLAS and EAA certified to the Sallie Mae Fund that the money would be used for no other purpose than the annual Fattah Conference on Higher Education.

19.     On or about January 28, 2008, BRAND advised Company 2's Chief Financial Officer ("CFO") that Company 2 would receive approximately $500,000 from EAA, and that the CFO was to thereafter wire transfer $600,000 to LSG.

20.     Also on or about January 28, 2008, NICHOLAS responded to BRAND at Company 2 from EAA's email account.   In the response, NICHOLAS advised BRAND that "You can pick up the check today as discussed, but as I stated I am not in a position to sign a contract committing funds that I am not sure that I will have."   Although no work justifying the $500,000 advance payment from EAA to Company 2 was ever performed by Company 2, NICHOLAS made the check available for pickup as described in the email to BRAND, who promptly dispatched a Company 2 employee to retrieve it.

21.     On or about January 28, 2008, at BRAND's direction, Company 2's CFO emailed Bank of America and requested a $150,000 draw down on Company 2's line of credit which was secured by assets belonging to BRAND's spouse, a former FATTAH Congressional staffer.   The CFO asked Bank of America to wire the money to Company 2's operational account.   BRAND directed the CFO to make this draw down to obtain the funds needed to add $100,000 to the $500,000 received from EAA for the $600,000 wire transfer to LSG.

22.     Although no work justifying the $600,000 advance payment from Company 2 to LSG was ever performed by LSG, on or about January 31, 2008, LSG received by wire transfer into its United Bank account a $600,000 payment from Company 2's Bank of America account.

23.     That same day, January 31, 2008, LSG sent $600,000 by wire transfer from its account at United Bank to Person D's account at Wachovia Bank, settling the outstanding loan balance FATTAH and FFM owed to Person D.

24.     At BRAND's direction, in Company 2's bookkeeping records, the transaction from EAA to Company 2 was falsely recorded as "implementation" income and the transaction from Company 2 to LSG was falsely recorded as a "marketing" expense.

25.     In or around March 2008, while DOJ auditors were auditing EAA regarding the

federal funds it had received, BRAND began contacting NICHOLAS to inquire about the contract

between Company 2 and EAA, which NICHOLAS still had not executed even though

NICHOLAS had already routed the $500,000 from EAA to Company 2 two months earlier.

26.     On or about March 23, 2008, NICHOLAS responded to BRAND that ". . . things

were getting a little uncomfortable now as I try to keep [EAA] afloat . . . And you should know that

in the future that as a result of the DOJ audit I will not be in a position to do another contract such

as this."  That same day, NICHOLAS forwarded that email exchange to FATTAH to apprise him

of the situation, and to solicit FATTAH's aid in getting BRAND to "back off" while NICHOLAS

was "doing [her] best to assist him."

### D.   Stealing Federal Grant Funds and Repaying Company 2

27.     To make Company 2 whole for its $600,000 wire transfer to LSG, on or about

May 19, 2008, NICHOLAS supplemented the $500,000 which NICHOLAS had already provided

to Company 2 with a second EAA check payable to Company 2 for $100,000.

28.     To issue the EAA check, NICHOLAS used funds EAA received from CORE

Philly, another entity founded by FATTAH, via cashier's check dated May 19, 2008, for $225,000.

29.     NICHOLAS documented the $225,000 cashier's check in EAA's bookkeeping

records as a "loan payable."

30.     In EAA's bookkeeping records, NICHOLAS falsely recorded the January 2008

payment to Company 2 as a "Computer Center:database" expense and the May 2008 payment as a

"professional fees: consulting" expense.

31.     To repay CORE Philly for the $100,000 EAA borrowed from it to write the second

check to Company 2, NICHOLAS illegally drew on $1,807,757 in funds EAA received from the

National Aeronautics and Space Administration ("NASA") via a federal grant, the terms of which required that the grant funds were to be spent in support of a "Math, Science, & Technology Enrichment Program" for "members of underrepresented groups" in the City of Philadelphia. EAA received the first draw down on the NASA grant on or about June 13, 2008, and placed the funds in EAA's operating account.   NICHOLAS then wrote a check drawn on EAA's operating account to CORE Philly for $415,000 that included repayment of the $100,000 NICHOLAS used from CORE Philly to pay Company 2.

32.   NICHOLAS never disclosed to NASA that $100,000 from the NASA grant was used to repay the loan from CORE Philly to EAA or that the CORE Philly loan enabled NICHOLAS to repay Company 2 for its role in the scheme to repay FATTAH's campaign debt to Person D, and NICHOLAS deliberately omitted references to the payment from documents submitted to the federal agency.

### E.   Obstructing Federal Agencies

33.   In the midst of the DOJ audit while NICHOLAS attempted to explain and justify EAA's questionable finances, DOJ's Office of Inspector General ("DOJ OIG") issued a subpoena *duces tecum* on or about July 17, 2008, to BRAND's Company 2, seeking any and all "contract documents, invoices, correspondence, timesheets, deliverables, and proof of payment, related to any services provided to or payments from [CORE Philly or EAA]."   This caused BRAND to email NICHOLAS on or about August 1, 2008 with a revision to the contract between Company 2 and EAA that NICHOLAS had previously requested, so that BRAND could respond to the subpoena with an executed contract bearing NICHOLAS's signature.

34.     After BRAND revised the contract, and nearly seven months after EAA made its initial $500,000 payment to Company 2 that was ultimately used by LSG to repay Person D, NICHOLAS executed the contract on behalf of EAA.

35.     Despite the fact that DOJ OIG had specifically requested all "proof of payment," NICHOLAS at EAA and BRAND at Company 2 omitted copies of the $500,000 check from EAA to Company 2 in their productions to DOJ OIG.

36.     On or about May 6, 2009, NASA OIG subpoenaed EAA's books and records. EAA made a partial production in response while NICHOLAS's representative negotiated with investigators to narrow the scope of the subpoena.   Prior to finalizing EAA's production to NASA OIG's subpoena, and prior to submitting a final closeout report to NASA regarding the agency's grant funds, NICHOLAS electronically changed the classification of the May 2008 payment to CORE Philly to hide the transaction.   In EAA's bookkeeping records, NICHOLAS modified the class of the "Professional Fees: consulting" expense from "Core Philly" to "Other: Commonwealth of Pennsylvania," a project not associated with CORE Philly in any way.   By making this change, neither EAA's accountant nor the firm hired to conduct an internal audit of EAA associated the payment with the NASA grant.

37.     In EAA's closeout report to NASA regarding how the agency's grant funds were actually spent, NICHOLAS again omitted any reference to the money being used to repay the loan to CORE Philly.

## II.  "Blue Guardians"

38.    To satisfy the debt FATTAH's campaign owed Lindenfeld and LSG, on or before February 19, 2009, Lindenfeld and others at LSG, at the direction of FATTAH, submitted to the Appropriations Committee of the United States House of Representatives a "FY 2010 APPROPRIATIONS PROJECT QUESTIONNAIRE," which sought $15 million in federal funding for "Blue Guardians."   Although "Blue Guardians" did not exist at the time, the questionnaire completed by Lindenfeld and others at LSG stated that "Blue Guardians is an environmental education and coastal heritage preservation effort working in poor communities along the Atlantic and Gulf Coasts, as well as the U.S. islands of the Caribbean Seas."

39.    In or around February 2009, FATTAH instructed Lindenfeld to use a Philadelphia address for "Blue Guardians" because FATTAH represented a Philadelphia constituency. FATTAH further directed Lindenfeld to discuss with BRAND using BRANDs' business address on South Broad Street in Philadelphia, Pennsylvania as the mailing address for "Blue Guardians." BRAND's address was not previously associated with Lindenfeld or LSG in any way.

40.    In or around February 2009, Lindenfeld contacted BRAND and secured BRAND's consent to use BRAND's business address on South Broad Street in Philadelphia, Pennsylvania as the mailing address for "Blue Guardians."

41.    On or about February 1, 2010, FATTAH and BOWSER reported FFM's outstanding campaign debt to LSG in the FFM campaign's mandatory public Campaign Finance Report filed periodically with the Commonwealth of Pennsylvania and the City of Philadelphia. In this filing, FATTAH and BOWSER falsely listed an "in-kind" contribution of $20,000 from Lindenfeld's LSG to the mayoral campaign and correspondingly reduced the reported debt owed to LSG.

42.     The Campaign Finance Report dated on or about February 1, 2010, was signed by
FATTAH and BOWSER, affirming that FFM "ha[d] not violated any provisions" of the applicable
campaign finance laws.

43.     On or before February 19, 2010, Lindenfeld and others at LSG submitted to the
Appropriations Committee of the United States House of Representatives an "FY 2011
APPROPRIATIONS PROJECT QUESTIONNAIRE" which sought $3 million in federal funding
for "Blue Guardians."   Although "Blue Guardians" still did not exist at the time, the completed
questionnaire repeated that "Blue Guardians is an environmental education and coastal heritage
preservation effort working in poor communities along the Atlantic and Gulf Coasts, as well as the
U.S. islands of the Caribbean Seas."

44.     On or about April 1, 2010, Lindenfeld emailed his attorneys tasked with generating
articles of incorporation for "Blue Guardians" and instructed them to use BRAND's business
address on South Broad Street in Philadelphia as a mailing street address for "Blue Guardians."

45.     On or about April 2, 2010, Lindenfeld and others, at Lindenfeld's direction, created
an email address, i.e., tlindenfeld@blueguardians.org, for use in corresponding with federal
agencies regarding "Blue Guardians."

46.     On or about April 8, 2010, Lindenfeld and his attorneys filed articles of
incorporation in the District of Columbia for "Blue Guardians."

47.     On or about April 8, 2010, Lindenfeld and others in Washington, DC applied for
and obtained an Employer Identification Number ("EIN") from the Internal Revenue Service
("IRS") for "Blue Guardians" by completing an online application submitted over the Internet and
transmitted to the IRS in Cincinnati, Ohio.

48.     On or about April 9, 2010, Lindenfeld opened a bank account in the name of "Blue Guardians" at SunTrust Bank.   Lindenfeld identified himself to SunTrust as the "President" of "Blue Guardians," and was the only signatory on the account.

49.     On or about April 30, 2010, Lindenfeld and others, in the name of "Blue Guardians," applied for a Data Universal Numbering System ("DUNS") number, a unique numeric identifier assigned to a single business entity in connection with that entity's credit reporting which is required for all federal grant applicants.

## III.   Fraud and Theft of Campaign Funds While Deceiving Campaign Creditors

50.     On or about the dates set forth below, BOWSER, at FATTAH's direction, disbursed funds from FFC's bank account in the amounts set forth below to FFM's account for the purpose of executing and attempting to execute the scheme described in Paragraphs 32-38:

| Overt Act | Date of Disbursement from FFC | Amount Disbursed to FFM |
|-----------|-------------------------------|-------------------------|
| 50(a) | January 4, 2008 | $10,000 |
| 50(b) | July 31, 2008 | $5,000 |
| 50(c) | August 31, 2009 | $5,000 |
| 50(d) | June 28, 2010 | $10,000 |
| 50(e) | November 19, 2010 | $5,000 |

51.     On or about the dates set forth below, BOWSER, at FATTAH's direction, issued checks drawn on FFM's account for the purpose of executing and attempting to execute the scheme described in Paragraphs 32-38.   BOWSER then knowingly placed the checks in an

authorized depository for mail, to be sent and delivered by the Postal Service, to Naylor who

knowingly received the checks at SLA:

| Overt Act | Date of Check from FFM | Amount Payable to SLA |
|-----------|------------------------|-----------------------|
| 51(a) | January 7, 2008 | $10,900 |
| 51(b) | March 26, 2009 | $1,500 |
| 51(c) | June 25, 2009 | $5,000 |
| 51(d) | April 5, 2010 | $3,000 |
| 51(e) | November 22, 2010 | $5,000 |

52.     In or around June 2008, on FATTAH's behalf and at FATTAH's direction,

VEDERMAN negotiated with Law Firm 1 to resolve FFM's campaign debt to Law Firm 1.

Pursuant to the negotiations, Law Firm 1 agreed to forgive portions of the debt owed by

FATTAH's FFM, and in exchange, FATTAH agreed to pay portions of the outstanding debt to

Law Firm 1 in installment payments.

53.     On or about the dates set forth below, Naylor, at FATTAH's direction, issued

checks drawn on SLA's account for the purpose of executing or attempting to execute the scheme

described in Paragraphs 32-38.   Naylor then knowingly placed the checks in an authorized

depository for mail, to be sent and delivered by the Postal Service, to Drexel University:

| Overt Act | Date of Check from SLA | Amount Payable | Payee |
|-----------|------------------------|----------------|-------|
| 53(a) | August 10, 2007 | $5,000 | Drexel |
| 53(b) | October 15, 2007 | $400 | Drexel |

| Overt Act | Date of Check from SLA | Amount Payable | Payee |
|---|---|---|---|
| 53(c) | November 14, 2007 | $400 | Drexel |
| 53(d) | December 13, 2007 | $400 | Drexel |
| 53(e) | January 13, 2008 | $400 | Drexel |
| 53(f) | January 15, 2008 | $400 | Drexel |
| 53(g) | February 13, 2008 | $400 | Drexel |
| 53(h) | March 14, 2008 | $400 | Drexel |
| 53(i) | April 12, 2008 | $400 | Drexel |
| 53(j) | May 13, 2008 | $400 | Drexel |
| 53(k) | June 12, 2008 | $400 | Drexel |
| 53(l) | July 9, 2008 | $400 | Drexel |
| 53(m) | August 12, 2008 | $400 | Drexel |

54.     On or about the dates set forth below, Naylor, at FATTAH's direction, issued checks drawn on SLA's account for the purpose of executing or attempting to execute the scheme described in Paragraphs 32-38.   Naylor then knowingly placed the checks in an authorized depository for mail, to be sent and delivered by the Postal Service, to Sallie Mae:

| Overt Act | Date of Check from SLA | Amount Payable | Payee |
|---|---|---|---|
| 54(a) | March 23, 2009 | $525.52 | Sallie Mae |
| 54(b) | April 21, 2009 | $525.52 | Sallie Mae |

| Overt Act | Date of Check from SLA | Amount Payable | Payee |
|---|---|---|---|
| 54(c) | June 3, 2009 | $525.52 | Sallie Mae |
| 54(d) | July 6, 2009 | $525.52 | Sallie Mae |
| 54(e) | July 6, 2009 | $525.52 | Sallie Mae |
| 54(f) | August 24, 2009 | $525.52 | Sallie Mae |
| 54(g) | September 28, 2009 | $525.52 | Sallie Mae |
| 54(h) | October 16, 2009 | $525.52 | Sallie Mae |
| 54(i) | November 19, 2009 | $525.52 | Sallie Mae |
| 54(j) | December 23, 2009 | $525.52 | Sallie Mae |
| 54(k) | January 22, 2010 | $525.52 | Sallie Mae |
| 54(l) | February 17, 2010 | $525.52 | Sallie Mae |
| 54(m) | March 19, 2010 | $525.52 | Sallie Mae |
| 54(n) | April 19, 2010 | $525.52 | Sallie Mae |
| 54(o) | May 25, 2010 | $525.52 | Sallie Mae |
| 54(p) | June 15, 2010 | $525.52 | Sallie Mae |
| 54(q) | July 15, 2010 | $525.52 | Sallie Mae |
| 54(r) | September 20, 2010 | $1,051.04 | Sallie Mae |
| 54(s) | November 8, 2010 | $525.52 | Sallie Mae |

| Overt Act | Date of Check from SLA | Amount Payable | Payee |
|---|---|---|---|
| 54(t) | November 18, 2010 | $525.52 | Sallie Mae |
| 54(u) | December 17, 2010 | $525.52 | Sallie Mae |
| 54(v) | April 6, 2011 | $2,102.08 | Sallie Mae |

55.     In or around June 2010, on FATTAH's behalf and at FATTAH's direction, VEDERMAN began negotiations with Printer 1 to resolve FFM's campaign debt to Printer 1.

56.     On or about December 16, 2011, pursuant to the negotiations, VEDERMAN, on FATTAH's behalf and at FATTAH's direction, offered to resolve the then outstanding $55,000 campaign debt FATTAH and FFM owed to Printer 1 by having FFM pay $25,000 no later than January 6, 2012, and, in exchange, Printer 1 agreed to forgive the remaining balance of $30,000.

### IV.   Concealing the Misuse of FATTAH's Campaign Accounts in Furtherance of FATTAH's Criminal Schemes and Deception Regarding FATTAH's Political Viability and Strength

57.     On or about the dates set forth below, in order to disguise the misuse of FATTAH's campaign accounts to execute the criminal schemes described above and to promote a false image of FATTAH's political strength and viability, members of the Enterprise, including FATTAH and BOWSER made false filings with federal, state, and local election agencies to conceal illegal contributions and expenditures:

| Overt Act | Date of Filing | Form | Schemes |
|---|---|---|---|
| 57(a) | June 15, 2007 | 30 Day Post-Primary Campaign Finance Statement (FFM) | Mayoral Campaign (loan) |
| 57(b) | January 31, 2008 | 2007 Campaign Finance Report (FFM) | Mayoral Campaign (loan) |

| Overt Act | Date of Filing | Form | Schemes |
|---|---|---|---|
| 57(c) | February 2, 2009 | Amended 2007 Campaign Finance Report (FFM) | Mayoral Campaign (loan); Tuition Scheme |
| 57(d) | February 2, 2009 | 2008 Campaign Finance Report (FFM) | Mayoral Campaign (loan); Tuition Scheme |
| 57(e) | February 11, 2009 | FEC FORM 3 (FFC) | Tuition Scheme |
| 57(f) | February 1, 2010 | 2009 Campaign Finance Report (FFM) | Mayoral Campaign (loan); "Blue Guardians;" Tuition Scheme |
| 57(g) | December 6, 2010 | FEC FORM 3 (FFC) | Tuition Scheme |
| 57(h) | January 26, 2011 | 2010 Campaign Finance Report (FFM) | Mayoral Campaign (loan); "Blue Guardians;" Tuition Scheme |
| 57(i) | January 31, 2012 | 2011 Campaign Finance Report (FFM) | Mayoral Campaign (loan); "Blue Guardians;" Tuition Scheme |
| 57(j) | January 30, 2013 | 2012 Campaign Finance Report (FFM) | Mayoral Campaign (loan); "Blue Guardians;" Tuition Scheme |
| 57(k) | January 31, 2014 | 2013 Campaign Finance Report (FFM) | Mayoral Campaign (loan); "Blue Guardians;" Tuition Scheme |

## V.   The Bribery and Fraud Scheme with a Pennsylvania Lobbyist

### A.   FATTAH's Official Acts for VEDERMAN

### The Pursuit of an Ambassadorship

58.    Beginning in late 2008 and continuing for years, FATTAH supported VEDERMAN's nomination for an ambassadorship, a post that VEDERMAN dearly coveted.

59.    In or around November 2008, FATTAH solicited in writing support from Elected Official B for VEDERMAN's nomination for an ambassadorial post almost as soon as the ballots were counted in the 2008 presidential election.

60.    FATTAH had another letter of support for VEDERMAN prepared for FATTAH's signature, which stated that VEDERMAN was willing to serve as an ambassador almost anywhere in the world, including hardship posts.

61.    In or around February 2010, a staffer, at FATTAH's direction, attempted to arrange a meeting with the Chief of Staff of the President of the United States to discuss an ambassadorship for VEDERMAN.

62.    In or around February 2010, FATTAH participated in a teleconference with an Elected Official D and the White House Deputy Chief of Staff ("DCOS"), during which FATTAH pressed the DCOS for an appointment for VEDERMAN in the Executive Branch.

63.    At FATTAH's direction, a FATTAH staffer followed up with the White House on numerous occasions to see whether FATTAH's support for VEDERMAN's nomination was progressing.

64.    In late October or early November 2010, FATTAH signed and hand-delivered to the President of the United States at an official event a letter dated October 30, 2010, advocating for VEDERMAN's appointment as a United States ambassador.

**The Pursuit of Another Executive Branch Position**

65.     In or around May 2011, with little progress made on securing an ambassadorship for VEDERMAN, FATTAH turned towards obtaining for VEDERMAN an appointment in the Executive Branch to a federal trade commission.

66.     In or around May 2011, FATTAH approached the U.S. Trade Representative at a reception and inquired whether he would meet with VEDERMAN to discuss such an appointment.

67.     After the U.S. Trade Representative agreed to take the meeting, FATTAH directed a staffer to follow up with a series of emails to set up a formal meeting between VEDERMAN and the U.S. Trade Representative.

68.     On May 20, 2011, at FATTAH's direction, a FATTAH staffer sent the U.S. Trade Representative a package of documents which included a copy of the letter FATTAH had signed and sent to Elected Official B lauding VEDERMAN's credentials and a short biographical description of VEDERMAN and other documents praising VEDERMAN.

69.     FATTAH's efforts culminated in a meeting arranged by FATTAH's staff between VEDERMAN and the U.S. Trade Representative on or about June 6, 2011.

**Hiring the Lobbyist's Girlfriend to the Congressional Staff**

70.     On or about December 26, 2011, VEDERMAN's girlfriend, A.Z., at VEDERMAN's direction, emailed BOWSER a letter addressed to FATTAH seeking federal employment.

71.     On or about December 28, 2011, BOWSER forwarded via email to FATTAH a letter of recommendation from A.Z.'s prior employer with the email message, "for Herb's lady."

72.     On or about January 19, 2012, just days after VEDERMAN wired FATTAH $18,000, at FATTAH's direction, BOWSER emailed A.Z. a letter formally offering A.Z.

employment with FATTAH's Congressional District office starting January 24, 2012 as a "Special Assistant to the Congressman."

### B.   VEDERMAN's Payments and Things of Value to FATTAH

#### Sponsorship of the Au Pair

73.    In or around August 2009, VEDERMAN sponsored FATTAH's live-in au pair, South African native S.M., for an F-1 student visa.

74.    On or about March 2, 2010, VEDERMAN issued a check for $3,000 for S.M.'s college tuition which cleared VEDERMAN's bank account on March 11, 2010.

#### Payments to FATTAH Through FATTAH's Son

75.    In or about April 2010, VEDERMAN gave FATTAH's son a check drawn on VEDERMAN's personal checking account at Bank of New York Mellon ("BNYM").   On or about April 15, 2010, FATTAH's son cashed the check, which had been made payable to the son in the amount of $3,500, and made two cash deposits totaling $2,310 to FATTAH's personal Sovereign Bank account.

76.    On April 15, 2010, drawing on the funds provided by VEDERMAN, FATTAH wrote a $2,381 check from his bank account, which cleared on April 28, 2010, to pay his 2009 Philadelphia city wages taxes.

77.    On approximately October 30, 2010, the same date appearing on the letter FATTAH hand-delivered to the President of the United States on VEDERMAN's behalf, FATTAH's son cashed a $2,800 check made payable to him and drawn on VEDERMAN's personal checking account.   In consensually monitored conversations on or about May 20, 2011, and July 22, 2011, between FATTAH's son and the son's former roommate, FATTAH's son

explained that he had provided FATTAH with "stacks" of cash whenever FATTAH needed money.

### The $18,000 Wire Transaction

78.     On January 13, 2012, VEDERMAN wired $18,000 to FATTAH, and six days later, on January 19, 2012, BOWSER emailed VEDERMAN's girlfriend, A.Z., welcoming her as a new employee to FATTAH's Congressional staff.

### VI.   Purchasing FATTAH's Pocono Vacation House and Deceiving CUMA

79.     On or about October 24, 2011, Person E emailed VEDERMAN at FATTAH's direction with a description that had been publicly posted on the website Zillow of a vacation home located at 139 Kara Lane, Shohola, Pennsylvania, in the Pocono Mountains region ("Poconos Property").

80.     On or about November 1, 2011, FATTAH and Person E made a purchase offer on the Poconos Property.

81.     On or about December 8, 2011, FATTAH and Person E executed a Real Property Sales Contract which set the purchase price of the Poconos Property at $425,000 and required FATTAH and Person E to (1) deposit $1,000 in escrow at the time of entry into the contract; (2) deposit another $75,000 in escrow within ten days of execution of the agreement; and (3) pay the balance of $349,000 at closing, which was scheduled for January 25, 2012.   The real estate purchase was contingent on FATTAH and Person E securing a mortgage for $320,000, and if FATTAH and Person E failed to perform any terms or conditions under the contract, the $76,000 held in escrow would be paid to the seller.

82.     On or about December 23, 2011, FATTAH and Person E deposited $75,000 in escrow towards the purchase of the Poconos Property.

83.     On or about December 28, 2011, FATTAH and Person E executed mortgage loan application documents created by the Credit Union Mortgage Association ("CUMA") for the Poconos Property, including: (1) an acknowledgement of a Good Faith Estimate ("GFE") stating that FATTAH and Person E would owe approximately $19,015.48 in total settlement charges at closing; and (2) a "Borrower Certification and Authorization" form, in which they acknowledged that "false statements or facts provided knowingly for the purpose of obtaining a mortgage loan is a federal crime punishable by fine or imprisonment, or both, as applicable under the provisions of Title 18, United States Code, Section 1014."

84.     On or about January 12, 2012, Person E emailed VEDERMAN, "I think its [sic] great you are interested in purchasing the Porsche.   I had talked to a coworker this past summer, but would much rather it be in your possession. . . Asking for $18,000 which is a steal . . ."

85.     On or about January 12, 2012, VEDERMAN emailed FATTAH with the message, "Love to purchase" and inquired about the next step.   FATTAH forwarded the email to BOWSER.

86.     On or about January 13, 2012, FATTAH emailed BOWSER and instructed her to fax the realty agreement for the Poconos Property to CUMA and to the realtor handling the purchase.   BOWSER replied that she had already done so.

87.     On or about January 13, 2012, BOWSER emailed VEDERMAN with wiring instructions for the $18,000 payment to FATTAH.   Specifically, BOWSER's email instructed VEDERMAN to wire payment to FATTAH's Wright Patman Congressional Federal Credit Union ("Wright Patman") account.

88.     On or about January 13, 2012, VEDERMAN instructed BNYM via email to wire the $18,000 to FATTAH's Wright Patman account.   VEDERMAN repeatedly emailed BNYM throughout the day to check on the status of the wire transfer.

89.     FATTAH responded to an inquiry from CUMA on or about January 17, 2012, after the financial institution emailed him at approximately 10:51 a.m. informing FATTAH that CUMA "[w]ill require documentation of source of funds for deposit made 1/13/2012 in the amount of $18,000.00.   Need to show by paper trail the evidence of where the funds came from."   In his response, FATTAH wrote at approximately 12:53 p.m. that the $18,000 deposit was the proceeds from the sale of a car and that this "non liquid asset was sold to meet the requirement we were notified of last week on Wednesday [January 11, 2012]."   FATTAH further stated that the proceeds were wired into FATTAH's account from the purported buyer's account and that the "paper work is in process and the new owner is available to confirm the purchase. . . .   If the mortgage is approved we need to schedule the closing to meet the agreement by 1-25-12."

90.     On or about January 17, 2012, at approximately 12:54 p.m., CUMA responded to FATTAH that "We will require a statement of sale of this car signed by you and the purchaser along with any documentation showing where the wire came from," and at approximately 1:09 p.m., FATTAH forwarded to VEDERMAN the email exchanges between FATTAH and CUMA referred to in Overt Act 89 so that VEDERMAN was aware of FATTAH's representations to CUMA and could corroborate FATTAH's representations, if asked.

91.     On or about January 17, 2012, at approximately 5:05 p.m., BOWSER emailed VEDERMAN and attached a document labeled "MOTOR VEHICLE BILL OF SALE."   In her email to VEDERMAN, BOWSER wrote, "Hi Herb, the attached document is for your signature.

Please sign and email back to me tomorrow, I'll send you a copy of the completed document. [Person E] has to get the title and will forward it to you.   Thanks, Bonnie."

92.     On or about January 19, 2012, BOWSER obtained a duplicate Pennsylvania Certificate of Title for Person E's Porsche through the Harrisburg office of long-time FATTAH political ally, Elected Official C.   BOWSER also obtained a notarized Assignment of Title for the Porsche even though neither Person E nor VEDERMAN appeared before the notary.

93.     On or about January 19, 2012, FATTAH provided to CUMA via email a copy of the Bill of Sale for the Porsche which had been backdated to January 16, 2012.   VEDERMAN had signed the Bill of Sale as "BUYER," Person E had signed as the "SELLER," and BOWSER had signed as "WITNESS."

94.     On or about January 19, 2012, FATTAH provide to CUMA in a separate email a copy of the duplicate Pennsylvania Certificate of Title for Person E's Porsche.   After receiving the documents, CUMA approved the mortgage for the Poconos Property.

95.     On or about January 21, 2012, after CUMA had approved the mortgage for FATTAH and Person E for the Poconos Property, FATTAH and Person E executed CUMA's Mortgage Loan Approval Certificate.   That same day, FATTAH forwarded the signed Mortgage Loan Approval Certificate to VEDERMAN via email.

## VII.   Defrauding NOAA with Fictional Conference on Higher Education

96.    On or about May 11, 2012, NICHOLAS filed with NOAA an application package as the President and CEO of EAA, requesting $50,000 in funding to be used towards the $400,000 total cost for the annual Conference on Higher Education.   The application proposed that the funds would be used between January 1, 2012, and June 30, 2012, but was not otherwise specific as to the date of the proposed event.

97.    In or around May 2012, when asked, NICHOLAS told a NOAA Program Officer that EAA had outstanding bills remaining from a previous conference.   NOAA advised NICHOLAS that NOAA grant funds could not be used to pay previous expenses, and could only be used for future expenses.   In reply, NICHOLAS falsely told the agency that EAA was planning another Conference for October 2012 and NOAA responded to NICHOLAS that NOAA's grant funds could potentially be used for the proposed Conference in October 2012.

98.    As EAA was winding down its operations and after NICHOLAS had already laid off EAA employees, in or around July 2012, NICHOLAS sent NOAA an additional narrative for the proposed Conference which falsely identified the date of the proposed event as October 19 through 21, 2012, at the Sheraton at 17th and Race Streets in Philadelphia.

All in violation of Title 18 United States Code, Section 1962(d).

## COUNT TWO

## CONSPIRACY TO COMMIT WIRE FRAUD
### 18 U.S.C. §§ 1343 and 1349

### Fraud Related to $1 Million Loan to 2007 Mayoral Campaign

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 5 through 9, 11 through 12, 16(a) through 16(b), 16(i) through 16(j), 17 through 26, and Overt Acts 1 through 37 and 57 of Count One are incorporated here throughout by reference.

2.      From in or around January 2007 and continuing through on or about January 31, 2014, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### ROBERT BRAND,
### KAREN NICHOLAS, and
### BONNIE BOWSER

conspired and agreed together and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is, to knowingly execute and attempt to execute, a scheme to defraud EAA and NASA, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and, in furtherance of the scheme, used interstate wires, and transmitted and caused to be transmitted sounds and signals in interstate commerce.

### Purposes of the Conspiracy

3.      It was a purpose of the conspiracy to obtain an illegal campaign loan and to fraudulently repay that loan with hundreds of thousands of dollars of misappropriated charitable

funds from Sallie Mae and federal grant funds from NASA which were intended for educational purposes.

    4.    It was further a purpose of the conspiracy to present FATTAH to the public as a perennially viable candidate for public office who honored his obligations to his creditors and was able to retire his publicly reported campaign debts.

    5.    It was further a purpose of the conspiracy to promote FATTAH's political and financial goals through deception by concealing and protecting the conspirators' activities from detection and prosecution by law enforcement officials and the federal judiciary, as well as from exposure by the news media, through means that included obstruction of justice and the falsification of documents, including Campaign Finance Reports, false invoices, contracts, and other documents and records.

    6.    On or about the dates set forth below, in order to execute and conceal the criminal scheme described above and to promote a false image of FATTAH's political strength and viability, FATTAH and BOWSER made false entries in the mayoral campaign's publicly filed Campaign Finance Statements by, among other things, publicly reporting the fictitious "debt" to Naylor's SLA and later reducing that "debt" by recording fictitious "contributions in kind" in the amount of $20,000 per calendar year.   The false filings included:

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 6(a) | June 15, 2007 | 30 Day Post-Primary Campaign Finance Statement (FFM) |
| 6(b) | January 31, 2008 | 2007 Campaign Finance Report (FFM) |
| 6(c) | February 2, 2009 | Amended 2007 Campaign Finance Report (FFM) |
| 6(d) | February 2, 2009 | 2008 Campaign Finance Report (FFM) |

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 6(e) | February 1, 2010 | 2009 Campaign Finance Report (FFM) |
| 6(f) | January 26, 2011 | 2010 Campaign Finance Report (FFM) |
| 6(g) | January 31, 2012 | 2011 Campaign Finance Report (FFM) |
| 6(h) | January 30, 2013 | 2012 Campaign Finance Report (FFM) |
| 6(i) | January 31, 2014 | 2013 Campaign Finance Report (FFM) |

The Campaign Finance Statements were signed by FATTAH and BOWSER, falsely affirming that FFM "has not violated any provisions" of the applicable campaign finance laws.

In violation of Title 18, United States Code, Sections 1343 and 1349.

## COUNT THREE

## CONSPIRACY TO COMMIT HONEST SERVICES WIRE FRAUD
## 18 U.S.C. §§ 1343, 1346, and 1349

### "Blue Guardians" Scheme

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 7, 8, 16(c), 16(i) through 16(j), 27 through 31, and Overt Acts 38

through 49 and 57 of Count One are incorporated here throughout by reference.

2.      From in or around January 2008 and continuing through on or about January 31,

2014, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere,

defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

conspired and agreed together and with others known and unknown to the Grand Jury, to commit

offenses against the United States, that is, to knowingly execute and attempt to execute, a scheme

and artifice to defraud and to deprive the citizens of the United States and the 2nd Congressional

District of Pennsylvania of their right to the honest services of FATTAH through bribery, and in

furtherance of the scheme used interstate wires and transmitted and caused to be transmitted

sounds and signals in interstate commerce.

### Purposes of the Conspiracy

3.      It was a purpose of the conspiracy to repay FATTAH's mayoral campaign debt

owed to his political consultant, Lindenfeld, by promising to use FATTAH's official office to

arrange a federal earmark for a non-existent entity named 'Blue Guardians."

4.     It was further a purpose of the conspiracy to present FATTAH to the public as a perennially viable candidate for public office who honored his obligations to his creditors and was able to retire his publicly reported campaign debts.

5.     It was further a purpose of the conspiracy to promote FATTAH's political and financial goals through deception by concealing and protecting the conspirators' activities from detection and prosecution by law enforcement officials and the federal judiciary, as well as from exposure by the news media, through means that included obstruction of justice and the falsification of documents, including "Appropriations Project Questionnaires" and Campaign Finance Reports, and other documents and records.

6.     On or about the dates set forth below, in order to execute and conceal the scheme, and to promote a false image of FATTAH's political strength and viability, FATTAH and BOWSER continued the deception by submitting false entries in the mayoral campaign's publicly filed Campaign Finance Statements reducing the debt to Lindenfeld and LSG by recording fictitious and misleading "contributions in kind" in the amount of $20,000 per calendar year:

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 6(a) | February 1, 2010 | 2009 Campaign Finance Report (FFM) |
| 6(b) | January 26, 2011 | 2010 Campaign Finance Report (FFM) |
| 6(c) | January 31, 2012 | 2011 Campaign Finance Report (FFM) |
| 6(d) | January 30, 2013 | 2012 Campaign Finance Report (FFM) |
| 6(e) | January 31, 2014 | 2013 Campaign Finance Report (FFM) |

The Campaign Finance Statements were signed by FATTAH and BOWSER, affirming that FFM

"has not violated any provisions" of the applicable campaign finance laws.

In violation of Title 18, United States Code, Sections 1343, 1346, and 1349.

## COUNT FOUR

### CONSPIRACY TO COMMIT MAIL FRAUD
### 18 U.S.C. §§ 1341 and 1349

#### Use of Campaign Funds to Pay Personal Student Debt

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 4, 7, 9, 16(d) through 16(e), 16(i) through 16(j), 32 through 38, and

Overt Acts 50 through 57 of Count One are incorporated here throughout by reference.

2.      From in or around January 2007 and continuing through in or around April 2011, in

the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

conspired and agreed together and with others known and unknown to the Grand Jury, to commit

offenses against the United States, that is, to knowingly execute and attempt to execute, a scheme

to defraud FFC, FFM, and FFM's creditors including, among others, Printer 1 and Law Firm 1,

and to obtain money and property by means of materially false and fraudulent pretenses,

representations and promises, and, in furtherance of the scheme, used the United States mails.

#### Purposes of the Conspiracy

3.      It was a purpose of the conspiracy to unlawfully use campaign funds by stealing

from the campaign accounts of FFC and FFM and funneling those funds through Naylor's

consulting company, SLA, to pay FATTAH's son's student loan debt owed to Drexel University

and Sallie Mae.

4.      It was further a purpose of the conspiracy to present FATTAH to the public as a

perennially viable candidate for public office who honored his obligations to his creditors and was

able to retire his publicly reported campaign debts.

5.     It was further a purpose of the conspiracy to withhold material information regarding the theft of campaign funds fraudulently used to pay the student debt of FATTAH's son from FFM's legitimate creditors in order to secure agreements from those creditors to forgive portions of various campaign debts owed by FATTAH and his mayoral campaign.

6.     It was further a purpose of the conspiracy to promote FATTAH's political and financial goals through deception by concealing and protecting the conspirators' activities from detection and prosecution by law enforcement officials and the federal judiciary, as well as from exposure by the news media, through means that included obstruction of justice and the falsification of documents, including Campaign Finance Reports, IRS 1099s, and other documents and records.

7.     On or about the dates set forth below, in order to disguise the misuse of FATTAH's campaign accounts to execute the criminal scheme described above and to promote a false image of FATTAH's political strength and viability, FATTAH and BOWSER made false filings with federal, state, and local election agencies to conceal illegal contributions and expenditures:

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 8(a) | February 2, 2009 | Amended 2007 Campaign Finance Report (FFM) |
| 8(b) | February 2, 2009 | 2008 Campaign Finance Report (FFM) |
| 8(c) | February 11, 2009 | FEC FORM 3 (FFC) |
| 8(d) | February 1, 2010 | 2009 Campaign Finance Report (FFM) |
| 8(e) | December 6, 2010 | FEC FORM 3 (FFC) |
| 8(f) | January 26, 2011 | 2010 Campaign Finance Report (FFM) |

| Act in Furtherance | Date of Filing | Form |
|---|---|---|
| 8(g) | January 31, 2012 | 2011 Campaign Finance Report (FFM) |
| 8(h) | January 30, 2013 | 2012 Campaign Finance Report (FFM) |
| 8(i) | January 31, 2014 | 2013 Campaign Finance Report (FFM) |

The FFM Campaign Finance Reports were signed by FATTAH and BOWSER, affirming that FFM "has not violated any provisions" of the applicable campaign finance laws.

In violation of Title 18, United States Code, Sections 1341 and 1349.

## COUNTS FIVE THROUGH TEN

### MAIL FRAUD
### 18 U.S.C. §§ 1341

### Use of Campaign Funds to Pay Personal Student Debt

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 4, 7, 9, 16(d), 16(i) through 16(j), 32 through 38 and Overt Acts 50 through 56 of Count One are incorporated here throughout by reference.

2.      Paragraphs 2 through 8 of Count Four are incorporated here throughout by reference.

3.      From in or around January of 2007 and continuing through in or around April of 2011, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

and others known and unknown devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

4.      On or about the dates set forth below, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

and others known and unknown to the Grand Jury, for the purpose of executing the scheme described above, and attempting to do so, knowingly placed and caused to be placed in an

- 54 -

authorized depository for United States Mail, to be sent and delivered by the Postal Service, the

following, each mailing constituting a separate count:

| Count | Mailing | Date |
|-------|---------|------|
| 5 | Check to Sallie Mae for $1,051.03 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | September 20, 2010 |
| 6 | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | November 8, 2010 |
| 7 | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | November 18, 2010 |
| 8 | Check to SLA for $5,000 drawn on FFM's bank account at Wachovia Bank and signed and mailed by defendant BOWSER | November 22, 2010 |
| 9 | Check to Sallie Mae for $525.52 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | December 17, 2010 |
| 10 | Check to Sallie Mae for $2,102.08 drawn on SLA's bank account at PNC Bank and signed and mailed by Gregory Naylor | April 6, 2011 |

In violation of Title 18, United States Code, Section 1341.

## COUNT ELEVEN

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 12, 16(a) through 16(e), 16(i) through 16(j), 17 through 38, and Overt Acts 1 through 57 of Count One are incorporated here throughout by reference.

2.      Paragraphs 3 through 6 of Count Two are incorporated here throughout by reference.

3.      Paragraphs 3 through 6 of Count Three are incorporated here throughout by reference.

4.      Paragraphs 3 through 8 of Count Four are incorporated here throughout by reference.

5.      Paragraph 4 of Counts Five through Ten is incorporated here throughout by reference.

6.      On or about January 26, 2011, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

while aiding and abetting one another, knowingly concealed, covered up, falsified, and made false entries in documents, specifically, the Fattah for Mayor Committee Commonwealth of Pennsylvania Campaign Finance Report (Cycle Year 2010), and made false entries in a record, specifically, SCHEDULE II, documenting "In-Kind Contributions And Valuable Things Received," SCHEDULE III, documenting "Statement of Expenditures," and SCHEDULE IV, documenting "Statement of Unpaid Debts," with the intent to impede, obstruct, and influence the

investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT TWELVE

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3 through 12, 16(a) through 16(e), 16(i) through 16(j), 17 through 38, and Overt Acts 1 through 57 of Count One are incorporated here throughout by reference.

2.      Paragraphs 3 through 6 of Count Two are incorporated here throughout by reference.

3.      Paragraphs 3 through 6 of Count Three are incorporated here throughout by reference.

4.      Paragraphs 3 through 8 of Count Four are incorporated here throughout by reference.

5.      Paragraph 4 of Counts Five through Ten is incorporated here throughout by reference.

6.      On or about January 31, 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER,

while aiding and abetting one another, knowingly concealed, covered up, falsified, and made false entries in documents, specifically, the Fattah for Mayor Committee Commonwealth of Pennsylvania Campaign Finance Report (Cycle Year 2011), and made false entries in a record, specifically, SCHEDULE II, documenting "In-Kind Contributions And Valuable Things Received," and SCHEDULE IV, documenting "Statement of Unpaid Debts," with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in

relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT THIRTEEN

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       Paragraphs 3 through 12, 16(a) through 16(e), 16(i) through16(j), 17 through 38, and Overt Acts 1 through 57 of Count One are incorporated here throughout by reference.

2.       Paragraphs 3 through 6 of Count Two are incorporated here throughout by reference.

3.       Paragraphs 3 through 6 of Count Three are incorporated here throughout by reference.

4.       Paragraphs 3 through 8 of Count Four are incorporated here throughout by reference.

5.       Paragraph 4 of Counts Five through Ten is incorporated here throughout by reference.

6.       On or about January 30, 2013, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER,

while aiding and abetting one another, knowingly concealed, covered up, falsified, and made false entries in documents, specifically, the Fattah for Mayor Committee Commonwealth of Pennsylvania Campaign Finance Report (Cycle Year 2012), and made false entries in a record, specifically, SCHEDULE II, documenting "In-Kind Contributions And Valuable Things Received," and SCHEDULE IV, documenting "Statement of Unpaid Debts," with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in

relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FOURTEEN

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3 through 12, 16(a) through 16(e), 16(i) through 16(j), 17 through 38, and Overt Acts 1 through 57 of Count One are incorporated here throughout by reference.

2.     Paragraphs 3 through 6 of Count Two are incorporated here throughout by reference.

3.     Paragraphs 3 through 6 of Count Three are incorporated here throughout by reference.

4.     Paragraphs 3 through 8 of Count Four are incorporated here throughout by reference.

5.     Paragraph 4 of Counts Five through Ten is incorporated here throughout by reference.

6.     On or about January 30, 2014, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER,

while aiding and abetting one another, knowingly concealed, covered up, falsified, and made false entries in documents, specifically, the Fattah for Mayor Committee Commonwealth of Pennsylvania Campaign Finance Report (Cycle Year 2013), and made false entries in a record, specifically, SCHEDULE II, documenting "In-Kind Contributions And Valuable Things Received," and SCHEDULE IV, documenting "Statement of Unpaid Debts," with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in

relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT FIFTEEN

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.  Paragraphs 3 through 4, 7, 9, 16(d), 16(i) through 16(j), 32 through 38, and Overt Acts 50 through 57 of Count One are incorporated here throughout by reference.

2.  Paragraphs 3 through 6 of Count Two are incorporated here throughout by reference.

3.  Paragraphs 3 through 6 of Count Three are incorporated here throughout by reference.

4.  Paragraphs 3 through 8 of Count Four are incorporated here throughout by reference.

5.  Paragraph 4 of Counts Five through Ten is incorporated here throughout by reference.

6.  On or about December 6, 2010, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR. and
### BONNIE BOWSER

while aiding and abetting one another, knowingly concealed, covered up, falsified, and made false entries in a document, specifically, a "FEC FORM 3" with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the Federal Election Commission ("FEC"), the U.S. Department of Justice ("DOJ"), and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT SIXTEEN

### CONSPIRACY
### 18 U.S.C. § 371

**Bribery**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.        Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2         From in or around January of 2007 and continuing through in or around April of 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### BONNIE BOWSER, and
### HERBERT VEDERMAN

conspired and agreed together and with others known and unknown to the grand jury, to commit an offense against the United States, that is:

a.        to, being a public official, directly and indirectly corruptly demand, seek, receive, accept, and agree to receive and accept money and things of value in return for being influenced in the performance of an official act; that is, FATTAH, a United States Representative, sought and received things of value from VEDERMAN, in order to influence FATTAH's official acts, in violation of Title 18, United States Code, Section 201(b)(2).

b.        to, directly and indirectly, corruptly give, offer, and promise money and things of value to a public official to influence an official act, that is offering to give FATTAH, a United States Representative, things of value to influence official acts benefiting VEDERMAN's personal and business interests, in violation of Title 18, United States Code, Section 201(b)(1).

c.     to devise and intend to devise a scheme and artifice to defraud the United

States of the honest services of FATTAH, a United States Representative elected by the citizens of

the 2nd Congressional District of Pennsylvania, in violation of Title 18, United States Code,

Sections 1343 and 1346.

In violation of Title 18, United States Code, Section 371.

## COUNT SEVENTEEN

### BRIBERY
### 18 U.S.C. § 201(b)(2)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.     From in or around October 2010 and continuing through in or around April 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### CHAKA FATTAH, SR.,

a public official, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept money and things of value from VEDERMAN, in return for being influenced in the performance of official acts.

In violation of Title 18, United States Code, Section 201(b)(2).

## COUNT EIGHTEEN

### BRIBERY
### 18 U.S.C. § 201(b)(1)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.      From in or around October 2010 and continuing through in or around April of 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### HERBERT VEDERMAN,

directly and indirectly, corruptly gave, offered, and promised money and things of value to FATTAH, a public official, with intent to influence official acts.

In violation of Title 18, United States Code, Section 201(b)(1).

## COUNT NINETEEN

### BANK FRAUD
### 18 U.S.C. §§ 1344 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.     Between in or around October 2011, through in or around January 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### HERBERT VEDERMAN, and
### BONNIE BOWSER,

aided and abetted by one another and others, knowingly executed, and attempted to execute, a scheme to defraud CUMA, a federally insured financial institution, and to obtain monies owned by and under the care, custody, and control of that financial institution by means of false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT TWENTY

### FALSE STATEMENTS TO FINANCIAL INSTITUTIONS
### 18 U.S.C. §§ 1014 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

      2.      On or about January 19, 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### HERBERT VEDERMAN, and
### BONNIE BOWSER,

aided and abetted by one another and others, knowingly made and caused to be made to CUMA false statements for the purpose of influencing the actions of CUMA, a federally insured financial institution, upon a $320,000 mortgage for defendants FATTAH and Person E as part of the purchase of a Poconos vacation home.   FATTAH claimed, among other false statements, that FATTAH and Person E had the independent financial resources to qualify for the mortgage and that an $18,000 wire transfer from VEDERMAN into FATTAH's bank account represented the proceeds of the private sale of Person E's car to VEDERMAN.   In fact, FATTAH, VEDERMAN, BOWSER, and Person E knew that no car sale had taken place and FATTAH and Person E still possessed, drove, titled, and continued to insure the car after the $18,000 payment was made, and VEDERMAN never took possession of the vehicle.

      In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-ONE

### FALSIFICATION OF RECORDS
### 18 U.S.C. §§ 1519 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.      On or about January 17, 2012, through on or about January 19, 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**CHAKA FATTAH, SR.,
HERBERT VEDERMAN, and
BONNIE BOWSER,**

aided and abetted by one another and others, knowingly concealed, covered up, falsified and made false entries in documents, specifically, a "MOTOR VEHICLE BILL OF SALE" with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Justice ("DOJ") and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Sections 1519 and 2.

## COUNT TWENTY-TWO

## MONEY LAUNDERING
## 18 U.S.C. §§ 1957 and 2

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.    On or about January 17, 2012, through on or about January 19, 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### HERBERT VEDERMAN, and
### BONNIE BOWSER,

aided and abetted by one another and others, knowingly engaged in, and attempted to engage in, and willfully caused, a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is: a scheme to commit bribery, in violation of Title 18, United States Code, Section 201:

| Date | Amount | Monetary Transaction |
|------|--------|----------------------|
| January 24, 2012 | $25,000 | Transfer from Chaka Fattah, Sr.'s Wright Patman account to Attorney N. A. B.'s escrow account for purchase of Poconos Property. |

In violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT TWENTY-THREE

### MONEY LAUNDERING CONSPIRACY
### 18 U.S.C. § 1956(h)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 4, 7, 10, 16(f) through 16(g), 16(i), 39 through 45 and Overt Acts 58 through 95 of Count One are incorporated here throughout by reference.

2.      Paragraph 2 of Count Twenty-Two is incorporated here throughout by reference.

3.      On or about January 17, 2012 through on or about January 19, 2012, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

### CHAKA FATTAH, SR.,
### HERBERT VEDERMAN, and
### BONNIE BOWSER,

knowingly conspired and agreed together and with others known and unknown to the Grand Jury to the transfer of the proceeds of a specified unlawful activity, that is: a scheme to commit bribery in violation of Title 18, United States Code, Section 201, and then knowingly engaged and caused another to engage in monetary transactions in criminally derived property that was of a value greater than $10,000.00 and was derived from said specified unlawful activity, and that affected interstate and foreign commerce.

In violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

### WIRE FRAUD
### 18 U.S.C. § 1343

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 3, 6, 9, 11, 16(h) through 16(i), 46 through 48, and Overt Acts 96 through 98 of Count One are incorporated here throughout by reference.

      2.      From in or around May 2012 and continuing through in or around January 2014, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### KAREN NICHOLAS

knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Manner and Means

      3.      The manner and means by which NICHOLAS would and did carry out the scheme included the following, among others:

          a.      Prior to October 2012, NICHOLAS submitted and caused to be submitted to NOAA false grant applications and documents claiming that NOAA's funding would be used for a future Conference.

          b.      After October 2012, NICHOLAS submitted and caused to be submitted to NOAA false documentation claiming that NOAA's grant funds had been used as intended on a Conference held in October 2012.

### Misuse of the NOAA Grant Funds

      4.      On or about March 14, 2013, EAA received and NICHOLAS began to use NOAA's grant funds on various expenses wholly unrelated to any proposed October 2012

National Conference on Higher Education, including payments to NICHOLAS, Naylor, and an attorney representing NICHOLAS.   Those payments include the following:

| Approximate Date | Payment | Amount |
|---|---|---|
| March 13, 2013 (in anticipation of NOAA funds) | Check No. 12429 drawn on EAA's operating account made payable to NICHOLAS for "Admin & Exec services" and deposited by NICHOLAS on or about March 14, 2013 | $2,000 |
| March 13, 2013 (in anticipation of NOAA funds) | Check no. 12434 drawn on EAA's operating account to Naylor's SLA which was deposited by Naylor and posted to EAA's operating account on or about March 19, 2013 | $20,000 |
| April 1, 2013 | Check No. 12456 drawn on EAA's operating account made payable to NICHOLAS for "Admin & Exec services" and deposited by NICHOLAS on or about April 1, 2013 | $3,000 |
| April 24, 2013 | Check No. 12463 drawn on EAA's operating account made payable to NICHOLAS for "Admin & Exec services" and deposited by NICHOLAS on or about April 24, 2013 | $4,500 |
| May 10, 2013 | Check No. 12485 drawn on EAA's operating account made payable to NICHOLAS and deposited by NICHOLAS on or about May 13, 2013 | $3,400 |
| May 23, 2013 | Check No. 12499 drawn on EAA's operating account made payable to NICHOLAS and deposited by Nicholas on or about May 23, 2013 | $1,000 |
| May 24, 2013 | Check No. 12509 drawn on EAA's operating account made payable to NICHOLAS for "Admin & Exec services" and deposited by NICHOLAS on or about June 25, 2013 | $4,500 |
| June 1, 2013 | Check No. 12504 drawn on EAA's operating account made payable to NICHOLAS for "Admin & Exec services" and deposited by NICHOLAS on or about June 13, 2013 | $4,500 |

| Approximate Date | Payment | Amount |
|---|---|---|
| July 3, 2013 | Check No. 12520 drawn on EAA's operating account made payable to NICHOLAS for "July 2013" and deposited by Nicholas on or about July 3, 2013 | $4,500 |
| July 3, 2013 | Check No. 12523 drawn on EAA's operating account made payable to the criminal defense attorney representing NICHOLAS and deposited by the attorney on or about July 9, 2013 | $10,000 |

5.     On or about each of the dates set forth below, in the City of Philadelphia, in the Eastern District of Pennsylvania and elsewhere, defendant

**KAREN NICHOLAS,**

for the purpose of executing the scheme described above, and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate commerce the following wire communications in the form of writings, signs, signals, pictures, and sounds as set forth, each transmission constituting a separate count:

| Count | Interstate Wire Communication (Electronic Communications) | Approximate Date |
|---|---|---|
| 24 | NICHOLAS submitted to NOAA via email EAA's formal application for federal grant funds for a National Conference on Higher Education, the dates of which were not specified. | May 11, 2012 |

| Count | Interstate Wire Communication (Electronic Communications) | Approximate Date |
|---|---|---|
| 25 | NICHOLAS submitted to NOAA via email a revised Project Description for the National Conference on Higher Education which excluded from the Conference budget meal purchases contained in EAA's first submission after NOAA advised NICHOLAS that grant funds could not be used for purchasing food, and which specified that the Conference was to be held on October 19 through 21, 2012, in Philadelphia. | July 10, 2012 |
| 26 | NICHOLAS submitted to NOAA via email the selection criteria for student participants purportedly attending the October 2012 Conference on Higher Education | August 30, 2012 |

6.      To further conceal the scheme, on or about November 7, 2013, NICHOLAS electronically submitted to NOAA a Federal financial report which certified, falsely, that EAA had spent the grant funds on an October 2012 Conference.

7.      To further conceal the scheme, on or about January 8, 2014, NICHOLAS electronically submitted to NOAA EAA's "FINAL" Performance Progress Report, backdated April 3, 2013, which falsely described in detail a Conference on Higher Education purportedly held "Friday, October 19 through Sunday, October 21, 2012" featuring "Congressman Chaka Fattah" as a "keynote speaker."

In violation of Title 18, United States Code, Section 1343.

## COUNT TWENTY-SEVEN

### MONEY LAUNDERING
### 18 U.S.C. § 1957

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 3, 6, 9, 11, 16(h) through 16(i), 46 through 48, and Overt Acts 96 through 98 of Count One are incorporated here throughout by reference.

      2.      Paragraphs 3 through 7 of Counts Twenty-Four through Twenty-Six are incorporated here throughout by reference.

      3.      On or about March 13, 2013 through on or about March 19, 2013, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### KAREN NICHOLAS

knowingly engaged in, and attempted to engage in, and willfully caused, a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is, a scheme to commit wire fraud, in violation of Title 18, United States Code, Section 1343:

| Approximate Date | Amount | Monetary Transaction |
|---|---|---|
| March 13, 2013 | $20,000 | Issued check no. 12434 drawn on EAA's operating account to Naylor's SLA which was deposited by Naylor and posted to EAA's operating account on or about March 19, 2013 |

      All in violation of Title 18, United States Code, Section 1957.

## COUNT TWENTY-EIGHT

### FALSIFICATION OF RECORDS
### 18 U.S.C. § 1519

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 6, 9, 11, 16(h), 46 through 48, and Overt Acts 96 through 98 of Count One are incorporated here throughout by reference.

2.      Paragraphs 3 through 7 of Counts Twenty-Four through Twenty-Six are incorporated here throughout by reference.

3.      On or about November 7, 2013, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### KAREN NICHOLAS,

knowingly concealed, covered up, falsified, and made false entries in documents, specifically, a financial report transmitted to NOAA which falsely certified that she had used NOAA's grant funds for a Conference on Higher Education purportedly held in October 2012, with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Commerce and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Section 1519.

## COUNT TWENTY-NINE

### FALSIFICATION OF RECORDS
### 18 U.S.C. § 1519

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 3, 6, 9, 11, 16(h) through 16(i), 42 through 44, and Overt Acts 96 through 98 of Count One are incorporated here throughout by reference.

2.      Paragraphs 3 through 7 of Counts Twenty-Four through Twenty-Six are incorporated here throughout by reference.

3.      Paragraph 3 of Count Twenty-Seven is incorporated here throughout by reference.

4.      On or about January 8, 2014, in the City of Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### KAREN NICHOLAS,

knowingly concealed, covered up, falsified, and made false entries in documents, specifically, EAA's "FINAL" Performance Progress Report, backdated to April 3, 2013, to NOAA, which falsely described in detail a Conference on Higher Education purportedly held "Friday, October 19 through Sunday, October 21, 2012" and featured as a keynote speaker "Congressman Chaka Fattah" with the intent to impede, obstruct, and influence the investigation and proper administration of a matter, and in relation to and contemplation of such matter, which was within the jurisdiction of a department or agency of the United States, specifically, the U.S. Department of Commerce and the Federal Bureau of Investigation ("FBI").

In violation of Title 18, United States Code, Section 1519.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     As a result of the violations of Title 18, United States Code, Sections 1956, and 1957 as set forth in this Indictment, the defendants,

**CHAKA FATTAH, SR.,**
**HERBERT VEDERMAN,**
**KAREN NICHOLAS, and**
**BONNIE BOWSER**

shall forfeit to the United States of America any property, real or personal, involved in such violation(s), and any property traceable to such property, including, but not limited to, the sum of $38,000.   If any of the property described above, as a result of any act or omission of the defendants:

      (a)     cannot be located upon the exercise of due diligence;

      (b)     has been transferred or sold to, or deposited with, a third party;

      (c)     has been placed beyond the jurisdiction of the Court;

      (d)     has been substantially diminished in value; or

      (e)     has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

      All pursuant to Title 18, United States Code, Section 982.

## SECOND NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violation(s) of Title 18, United States Code, Sections

1014, 1341, 1343, and 1344, set forth in this indictment, defendants,

**CHAKA FATTAH, SR.,
HERBERT VEDERMAN,
ROBERT BRAND,
KAREN NICHOLAS, and
BONNIE BOWSER**

shall forfeit to the United States of America any property, real or personal, that constitutes or is

derived from proceeds traceable to such property, including, but not limited to, the sum of

$764,663.52.

2.      If any of the property subject to forfeiture, as a result of any act or

omission of the defendant(s):

      (a)      cannot be located upon the exercise of due diligence;

      (b)      has been transferred or sold to, or deposited with, a third party;

      (c)      has been placed beyond the jurisdiction of the Court;

      (d)      has been substantially diminished in value; or

      (e)      has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United

States Code, Section 981(a)(1)(C).

## THIRD NOTICE OF FORFEITURE (RICO FORFEITURE)

1.      As a result of the violation of Title 18 United States Code, Section, 1962 set forth in this Indictment, the defendants,

**CHAKA FATTAH, SR.,
HERBERT VEDERMAN,
ROBERT BRAND,
KAREN NICHOLAS, and
BONNIE BOWSER**

shall forfeit to the United States of America:

(a)      any interest acquired and maintained in violation of Title 18, United States Code, Section 1962;

(b)      any interest in, security of, claims against, or property or contractual rights of any kind, which afford a source of influence over, any    enterprise established, operated, controlled, conducted, and participated in the conduct of such violation of Title 18, United States Code, Section 1962,

(c)      any property constituting or derived from proceeds obtained, directly and indirectly, from such racketeering violationactivity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3), including, but not limited to the sum of $769,973.52.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

- 84 -

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 1963.


**A TRUE BILL:**


_____
**FOREPERSON**


**ZANE DAVID MEMEGER**
**United States Attorney**        **First Assistant U.S. Attorney**